UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 04-10336-NMG |
| ) | |
| JULIO CARRION SANTIAGO et al. ) | |
| Defendants ) | |

**GOVERNMENT'S MOTION IN LIMINE TO INTRODUCE EVIDENCE OF
DEFENDANTS' HEROIN TRAFFICKING**

**Introduction**

The United States, by and through its undersigned attorneys, hereby moves in limine to introduce into evidence at trial the additional heroin trafficking evidence (1) recovered by the Lowell Police pursuant to a search warrant executed on April 18, 2003, at 261 Aiken Avenue, Apartment 2, Lowell, Massachusetts, the residence Jose O. Rodriguez ("Rodriguez"), and (2) recovered during the arrest of Pedro A. Miranda ("Miranda"), a/k/a Carlos Colon, and seized from 129 Westford Street, Apartment #6, Lowell, and 11 Payne Street, Lowell, MA, on September 28, 2002. This evidence is intrinsic to the conspiracy charged and therefore admissible without regard to the strictures of Rule 404(b). Even assuming that Rule 404(b) controls, however, the evidence should be admitted under that rule because it is probative of the defendants' knowledge about and participation in the charged conspiracy, his intent to distribute the heroin he possessed, and a common plan or scheme to distribute heroin. Finally, the government expects that this evidence will also be admissible to explain, in part, how it is that the Drug Enforcement Administration (DEA) came to focus on Rodriguez, Miranda and other individuals as part of a narcotics investigation, and to corroborate the testimony of agents and investigators involved in the investigation of Rodriguez

and others if their credibility is attacked by the defendants.

## Procedural History

Twelve defendants, including Rodriguez and Miranda, are charged in a Superseding Indictment with conspiring to distribute and possess with intent to distribute one kilogram or more of heroin between in or about December 2003 to on or about October 15, 2004 (Count One). Reynaldo Rivera and others are also charged with five counts of distribution and possession with intent to distribute heroin and aiding and abetting on diverse dates beginning December 10, 2003 (Counts Two through Six). Julio Santiago alone is charged in Counts Seven and Eight with possession of firearms in furtherance of drug trafficking and possession of unregistered firearms.

The conspiracy charge (and the other charges in the Indictment in which Rodriguez and Miranda are not named) arise out of a long-term wiretap investigation conducted by agents and officers of the Drug Enforcement Administration ("DEA") and other law enforcement agencies. A more complete summary of this investigation is contained in the government's opposition to the motions to suppress of co-defendants Zuleima Reyes, Julio Santiago, Pedro Alberto Miranda (a/k/a Carlos Colon) and Edwin Torres, filed on June 6, 2005, and the government's opposition to Luis Sanchez's motion to suppress evidence obtained pursuant to court-authorized wiretaps, filed on June 27, 2005. For the purpose of addressing this limited motion, the government sets forth a very cursory overview of the facts pertinent to this motion.

## Factual Background

### Initial Investigation of the Defendants

The charges against the defendants arose out an investigation conducted by DEA. Information from a confidential informant ("CI-3") and subsequent law enforcement surveillance

revealed that an individual (later identified as co-defendant Reynaldo Rivera) was engaged in a series of apparent drug transactions occurring in the parking lot of Rivera's residence at the Old English Village apartment complex at 235 18th Street in Dracut and that usually Rivera engaged in these hand-to-hand exchange with the operator of a minivan driven by a male later identified as Santiago. Prior to the date of the conspiracy charged in the Superseding Indictment, physical surveillance in 2003 confirmed Rivera meeting with Santiago in the parking lot outside 235 18th Street, and trash-pulls associated with Rivera during this same time period uncovered evidence of drug distribution.[1]

Between December 2003 and January 2004, an undercover agent arranged several heroin transactions with Rivera. In each of these transactions, the undercover agent would negotiate the price and quantity of heroin and the location (usually Showcase Cinema parking lot in Lowell) to receive the heroin with Rivera (or with co-defendant Zuleima Reyes who would then contact Rivera) by telephone. Pen register data showed that Rivera's cell phone was then in contact with a telephone subscribed to by one of Rivera's runners, co-defendants Santiago Arroyo or Zuleima Reyes. Pen register data also showed that the Rivera cell phone called Reyes' cell phone after his meeting with Santiago. Subsequently intercepted calls pursuant to TIII orders, surveillance and seizures confirmed that Santiago was Rivera's source of supply.

---

[1] To be clear, the government reserves the right to introduce into evidence at trial the "trash-pull" evidence from Rivera and observations made during physical surveillance of Rivera, Santiago, Torrado and others preceding the date charged in the indictment (December 2003). These physical surveillance and trash pulls are described in the DEA-6 Reports previously supplied to the defense, and are offered as intrinsic evidence of the ongoing charged conspiracy as well as to explain, in part, how it is that the DEA came to focus their investigation on these individuals for drug distribution. See United States v. Tutiven, 40 F.3d 1, 5 (1st Cir. 1994) (circumstantial evidence "intrinsic" to the crime for which the defendant is admissible independent of Rule 404(b)).

**Court-Authorized Interception of Wire Communications Confirm Santiago, Rivera, Rodriguez, Miranda and Others are Conspiring to Distribute Heroin**

As detailed in the government's previous oppositions to motions to suppress, beginning in March 2004 the DEA wiretapped five telephones and one paging device belonging to Santiago and/or his associates. Intercepted calls over the Target Telephones confirmed that Santiago was supplying large quantities of heroin not only to his main customer, Rivera, but was making regular deliveries to and collecting drug monies from or otherwise dealing with numerous other drug customers, including Rodriguez and Miranda; that he had numerous drug associates including Rodriguez and Miranda; and that he had a source of supply in New York (later identified as co-defendant Juan Nunez).

At the conclusion of the wiretap investigation on October 14, 2004, police stopped Santiago in his minivan after he had met with Juan Nunez in New York to receive a large quantity of heroin. Inside a hidden compartment in Santiago's van agents discovered approximately 500 grams of heroin. A search of Santiago's apartment in Leominster on October 15, 2004, uncovered approximately 78 grams of heroin, digital scales, a money counter, a finger press, a 9 mm Luger firearm and three silencers. For reasons apparent below, it is important to note that surveillance officers observed and video tapes recorded Santiago having a pony tail during the course of the investigation.

Inside Rivera's apartment at 235 18th Street, Dracut, MA, agents discovered approximately 200 grams of heroin, a finger press, latex gloves and $3,200 in cash.

When agents went to 261 Aiken Avenue, 2nd Floor, Lowell, to execute an arrest warrant, Rodriguez refused to allow them entry. After breaching the door, agents found Rodriguez in the

bathroom inside the apartment. Inside his left hand and on the floor next to his feet agents found heroin, which was contained in two plastic bags with an apple imprint. Those two apple-imprint bags contained additional baggies depicting an astronaut with a "moonwalk" logo. These "moonwalk" baggies are the precise type of baggies that were confiscated from Rodriguez's apartment on April 18, 2003. Moreover, the apple bags and moonwalk baggies are the exact same type of bag that was seized from Rodriguez's co-defendant, Enrique Agosto, on May 5, 2004 (during the charged conspiracy), after Agosto fled from Lowell Police detectives.

A search of Miranda's residence at 212 Wilder Street, Lowell, at the conclusion of the investigation uncovered, among other things, inositol (an agent used to dilute heroin), a surgical mask, rubber gloves, personal papers, and a false social security card in the name of "Carlos Colon."

### Rodriguez Receives 60 Grams of Heroin from Santiago, Which is Subsequently Intercepted by Agents and the Lowell Police

At approximately 11:49 a.m. on June 6, 2004, during the course of an intercepted conversation, Santiago asked if Rodriguez "still need[ed] 'the money'" and Rodriguez answered affirmatively. Santiago then indicated that he was going to take "sixty (60) dollars" out of the bank and would then call Rodriguez, but asked if Rodriguez would be there for sure so that Santiago did not make the trip for nothing. Rodriguez assured that he would be there. Rodriguez indicated that he would be available before 3:00 p.m. Santiago then reiterated that he would withdraw "that" from that "account" and they agreed to speak again later. TFA Marcos Chavez, who was monitoring this conversation and who had personally negotiated in undercover capacity with Rivera to purchase heroin, understood this intercepted conversation to mean that Santiago was confirming that Rodriguez still wanted to purchase sixty (60) units of heroin and agreed to deliver them that

afternoon.

Surveillance was subsequently established shortly after noon near Santiago's residence. At approximately 2:30 p.m., a surveillance unit saw Santiago drive his vehicle ("Santiago minivan") out of a small lot behind his 264 Mechanic Street residence. At approximately 3:32 p.m., Santiago called Rodriguez, asked if the latter was available and indicated that he had been waiting for Rodriguez's call. Toward the end of the conversation, Santiago said he was leaving now to go "there" (meaning to meet Rodriguez). At approximately 4:06 p.m., Santiago called Rodriguez and indicated he was "there" but asked how things were because he saw too many cars there. Rodriguez reassured him that everything was fine and Santiago repeated that he had arrived.

At approximately 4:10 p.m., four minutes after Santiago's last call to Rodriguez stating that he was "there," a surveillance agent saw Santiago driving the Santiago minivan slowly past Rodriguez's residence at 261 Aiken Street in Lowell. After parking Santiago's minivan, Santiago was seen seated in Santiago's minivan, bending and shifting from one side to another, as if retrieving something from the van's interior. Approximately one minute later, the surveillance agent saw Santiago exit Santiago's minivan and appear to fold something under and then pull the bottom of his shirt. Another surveillance officer then saw Santiago walk to the rear of the residence and walk up the stairs to Rodriguez's second-floor apartment at 261 Aiken Avenue. Less than 30 minutes later, at approximately 4:39 p.m., a third surveillance officer saw Santiago exit the residence, return to the Santiago minivan and drive it out of the area. At approximately 6:40 p.m., a surveillance officer saw Rodriguez exit his apartment and walk from the rear of the premises out to Aiken Avenue, looking cautiously in all directions and with his right hand shoved deeply into the right pocket of his baggy running pants. Approximately a block and a half from his residence, Rodriguez

saw and waved down a car driven by a Hispanic male later identified as Santiago Navarro. Rodriguez entered the front passenger seat of the BMW and the car then drove off.

A short while later, the BMW was stopped by police. Specifically, Lowell detectives stopped the BMW on Cabot Street in Lowell and ordered both occupants out of the car. As Detective John Samaras pat-frisked Rodriguez a clear plastic baggie containing a "finger" of heroin (weighing approximately 10 grams) fell from Rodriguez's pant leg. A fully-loaded .22 caliber revolver was subsequently found wrapped in clothing within a carrying case and concealed under the driver's seat of the BMW. A small amount of marijuana was also located in the vehicle. The driver, Navarro, had $1,430 in cash on him, and Rodriguez had $270. Both men were arrested.

Following Rodiguez's arrest, the Lowell Police Department obtained a state warrant to search his apartment at 261 Aiken Avenue, 2nd Floor, Lowell. During the search of Rodriguez's apartment pursuant to the warrant, an additional 50 grams of heroin were seized. (Couchman Aff. ¶ 55). Documents in the name of "Jose Rodriguez" and "Jose Orlando Rodriguez" were also discovered inside the second-floor apartment at 261 Aiken Avenue.

The sequence of intercepted calls between Santiago and Rodriguez, the subsequent surveillance and seizure from Rodriguez and Rodriguez's residence, confirmed that the "sixty dollars" referenced in Santiago's initial June 6 telephone conversation with Rodriguez was a coded reference to 60 grams of heroin (the 10 grams of heroin seized from Rodriguez's person and the 50 grams of heroin seized from his residence).

### Miranda, a/k/a "Tavo" and "Carlos Colon," is Intercepted During the Wire Discussing Narcotics Related Matters with Santiago

Surveillance and interceptions revealed that MIRANDA allowed SANTIAGO to use his

residence at 212 Wilder Street in Lowell as a meeting place for drug deals, allowed SANTIAGO to store money and drugs there when SANTIAGO was concerned that there was surveillance of him, and served as a lookout for surveillance while SANTIAGO conducted drug business at his residence.

The government will admit evidence that SANTIAGO would, at various times, use TAVO's residence as a meeting place for transactions with his drug customers and as a temporary storage place for money and drugs. For example, on August 27, 2004, at approximately 5:51 p.m., TAVO called SANTIAGO on Target Telephone TAVO and SANTIAGO discussed various things. Later in the conversation, SANTIAGO told TAVO that he had gone there (to TAVO's residence) and had "left some papers" in the room that TAVO was painting. SANTIAGO told TAVO that he had done so, because TAVO had told SANTIAGO earlier that there were police around there ready to give SANTIAGO a "ticket." SANTIAGO also told TAVO that he had left TAVO's house on foot, and that the police had followed him. SANTIAGO repeated that he left the "papers" in the closet behind the stereo, behind some shoes. TAVO replied that it was "no problem" because he was going there right away. Tavo also stood outside his home at Wilder Street sweeping and looking about in a manner consistent with counter surveillance on various dates while Santiago and others conducted drug dealings in his home. Other calls between Miranda and Santiago of a similar nature were intercepted.

### The Additional Heroin Trafficking Information

*Jose Rodriguez*

In April 2003, Lowell Detective Felix Figueroa received information from two confidential informants regarding the heroin distribution activities of Rodriguez in Lowell. After receiving this information, Lowell police applied for and received a state search warrant for Rodriguez's residence

at 261 Aiken Avenue, 2nd Floor, Lowell. On April 18, 2003, officers executed the warrant and uncovered a large quantity of heroin. Specifically, officers discovered the following items in Rodriguez's apartment: seventy-seven (77) heat-sealed baggies of heroin depicting an astronaut with a "moonwalk" logo; one larger bag containing heroin; $5,817 in cash; a Tanita digital scale; and personal papers belonging to Jose O. Rodriguez. Officers discovered $108.00 and six open bags of heroin on the person of his live-in girlfriend, Pamela Goulart, who was present when officers executed the warrant. In addition, officers found documents consistent with "cuff sheets" or drug ledgers in Rodriguez's motor vehicle. Documents associated with the search of Rodriguez's residence are attached as Attachment 1.

*Pedro Miranda*

On September 28, 2002, Lowell police responded to an automobile dealership located at 11 Payne Street, Lowell, in an attempt to locate a suspect with respect to cocaine that had been previously seized from 129 Westford Street, Apt. # 6, Lowell. Upon their arrival, Detective Jose Rivera met Miranda and questioned him about the location of the suspect after a witness had identified Miranda as the suspect's best friend. After receiving confusing statements from Miranda about whether the suspect was inside a trailer located at the dealership, Detective Rivera and other officers searched the trailer for the suspect and in doing so observed in plain view a clear plastic bag containing a tan substance which appeared to be heroin.[2] The defendant was arrested and $1,505.00 was confiscated from him.

---

[2] Miranda was charged in Middlesex Superior Court with Trafficking in over 28 grams of heroin as a result of what transpired on September 28, 2002. He is currently in default on that charges as a result of his arrest in this case. The assistant district attorney assigned to that case informed the undersigned prosecutor that Miranda's motion to suppress the items seized on September 28, 2002, was denied by a superior court justice.

Later that date, officers executed a search warrant at 11 Payne Street. During the search, officers uncovered a large quantity of heroin in "fingers" (10-gram increments) -- which is the exact manner in which heroin had been seized in the current case. Also found in a desk drawer inside in 11 Payne Street was paperwork in the name of Pedro "Gustavo." During the wiretap, Miranda was frequently referred to as "Tavo."

Significantly, Miranda was overheard making the following statement during a telephone call at the booking desk at the Lowell Police Department after his arrest: "call the guy with the ponytail -- you know who that is -- at phone number 804-8205 and tell him that they took the stuff but that I will reimburse him." During surveillance in mid 2003 and throughout the investigation, Santiago had a ponytail. In fact, he was videotaped with a ponytail arriving at locations for suspected heroin deliveries.

Miranda's fingerprints were submitted to the FBI fingerprint analysis section after his arrest. Though he gave the name "Carlos Colon," during his arrest on September 28, 2002, the FBI determined that he also went by the aliases Pedro Alberto Miranda and Pedro Alberto Mairanda in Florida and New York. The government has already alerted Miranda of its intent to admit this identification evidence at trial along with testimony from an experienced narcotics investigator that it is not an uncommon practice for drug dealers to employ different identities in an effort to thwart law enforcement detection and investigation. Documents associated with Miranda's arrest and the execution of the search warrant on September 28, 2002, are attached as Attachment 2.

## Argument

1. **The evidence seized from Rodriguez's home and vehicle on April 18, 2003, is directly relevant to the charged conspiracy**

The evidence of Rodriguez's and Miranda's additional heroin trafficking is directly relevant to the conspiracy charged and therefore admissible irrespective of the constraints of Rule 404. Because the government has alleged that Rodriguez and Miranda conspired to distribute and possessed with intent to distribute one kilogram or more of heroin between in or about December 2003 to on or about October 15, 2004, the jury should be entitled to make the inference that the evidence seized on September 28, 2002 -- just 14 months prior to the charged conspiracy -- and April 18, 2003 – just eight months prior to the charged conspiracy – is relevant evidence of their on-going involvement in drug trafficking activity.

By its terms, Rule 404(b) excludes only extrinsic evidence i.e., "evidence of *other* crimes, wrongs, or acts" where the probative value of the evidence is limited to the inference of "criminal propensity." United States v. Trenkler, 61 F.3d 45, 56 (1st Cir. 1995). Circumstantial evidence "intrinsic" to the crime for which the defendant is on trial is simply not governed by Rule 404(b). United States v. Tutiven, 40 F.3d 1, 5 (1st Cir. 1994). Hence, the discovery in the months leading up to the charged conspiracy of the same illegal substance charged in this case, heroin, at the same location where Rodriguez received 60 grams of heroin from Santiago [Rodriguez's residence at 261 Aiken Avenue], and linked to Miranda and the main target of the investigation, Miranda's supplier -- "the man with the ponytail" -- is directly relevant to the government's charge that Rodriguez and Miranda involved in heroin trafficking during the period alleged in the indictment.

The First Circuit recognizes the importance of such evidence and its admissibility in drug prosecutions. E.g., United States v. Taylor, 284 F.3d 95, 101 (1st Cir. 2002); United States v. Manning, 79 F.3d 212, 218 (1st Cir. 1996). Regardless of whether that evidence is admitted as direct evidence of the conspiracy or as 404(b) evidence of Rodriguez's' intent and knowledge, the jury

should be entitled to consider it.

### 2. The government's evidence of Rodriguez's and Miranda's additional heroin trafficking is admissible under Rule 404(b) to show knowledge, intent, and a common plan.

Even if the Court concludes that the government's additional evidence of Rodriguez's and Miranda's heroin trafficking is not intrinsic to the conspiracy alleged, it is still admissible under 404(b) as "other crimes, wrongs, or acts" probative of motive, intent, plan, and knowledge. See Manning, 79 F.3d at 217 (evidence of defendant's prior drug dealing "highly probative of the knowledge and intent elements" of drug charge). Because Rodriguez and Miranda are charged with conspiracy, the admissibility of his prior bad acts is governed by the First Circuit's "clear rule" favoring the admission of prior narcotics trafficking as 404(b) evidence as proof of intent, knowledge, etc. See United States v. Garcia, 983 F.2d 1160, 1173 (1st Cir. 1993) (collecting cases).[3]

The additional evidence of Rodriguez's and Miranda's heroin trafficking is admissible because it: (1) has "special relevance" in establishing intent and knowledge, and a common plan; and (2) its probative value is not substantially outweighed by the risk of undue prejudice. United States v. Hadfield, 918 F.2d 987, 994 (1st Cir. 1990).[4]

---

[3] The decision to admit evidence under Rule 404(b) is left to the sound discretion of the trial judge, and will be reversed only for abuse of discretion. Manning, 79 F.3d at 217 (citation omitted). In cases, such as this one, where the 404(b) evidence is probative of issues such as knowledge or intent, "the prohibition against admission of character evidence is construed broadly." Garcia, 983 F.2d at 1172 (citing United States v. Flores Perez, 849 F.2d 1, 4 (1st Cir. 1988)). "While there is a possibility that jurors may draw impermissible inferences about defendant's character or propensity from the fact of his prior conviction, such a possibility is irrelevant to the first step of the admissibility analysis . . . ." Id. (citing United States v. Ferrer Cruz, 899 F.2d 135, 138 (1st Cir. 1988)).

[4] Rule 404(b) evidence is deemed to have special relevance if the evidence "would allow a juror to make at least one inference probative" of a material issue. United States v. Nickens, 955 F.2d 112, 124, 125 (1st Cir.) (citations omitted). In Nickens, the Court of Appeals affirmed the

Here, the jury should be permitted to infer that Rodriguez's and Miranda's additional heroin trafficking makes it more likely that they intended and planned to distribute heroin during the course of the charged conspiracy, and did so knowingly and intentionally. The heroin contained in "moonwalk" baggies, scale, cash, and other evidence found at 261 Aiken Avenue on April 18, 2003, clearly shows Rodriguez's preparation for and involvement in the drug trafficking alleged. This evidence simply makes it more likely that Rodriguez knew about and actively participated in the instant conspiracy. See, e.g., Manning 79 F.3d at 217 (fact that defendant "had previously sold cocaine makes it more likely both that he was aware of the contents of the plastic bags in the briefcase and that he intended to distribute the two bags of cocaine"); Carty, 993 F.2d 1011 (prior drug convictions had "special relevance" to possible intent or plan to distribute). Indeed, the "moonwalk" baggies seized from Rodriguez's apartment on April 18, 1003, and taken from Rodriguez during his arrest inside his apartment on October 15, 2004, are also the exact type of "moonwalk" baggies taken from co-defendant Enrique Agosto on May 5, 2004 (during the charged conspiracy) by Lowell detectives. Hardly a coincidence.

Similarly, the fact that Miranda was arrested after a large quantity of heroin -- in "finger" form no less - had been found at a location connected to him by his physical presence as well as

---

admission of the defendant's prior narcotics convictions, concluding that a reasonable jury could have inferred that the defendant's prior experience selling cocaine made it more likely that he knew how drug traffickers operate, and therefore less likely that he had been duped by two friendly young men who, according to the defendant, had planted drugs in his suitcase. Id. See also United States v. Moccia, 681 F.2d 61, 63 (1st Cir. 1982) (jury can "infer that one who lives on a farm with marijuana in the freezer room and under the chicken coop and has a prior possession conviction is more likely to know about the presence of marijuana than one who lives on such a farm and does not have a past possession conviction"); United States v. Carty, 993 F.2d 1005, 1011 (1st Cir. 1993)(affirming admission of "bad act" evidence because it "permitted at least one relevant non-propensity and non-character based inference") (citation omitted).

documents in the name of "Pedro Gustavo" -- particularly where he went by the name "Tavo" during the wiretap -- clearly shows Miranda's preparation for and involvement in the drug trafficking alleged. Moreover, the jury could infer that the heroin seized from Miranda just 14 months prior to the charged conspiracy came from Santiago ("the man with the ponytail -- you know who") and therefore it has special relevance in this case. Put bluntly, this evidence simply makes it more likely that Miranda knew about and actively participated in the instant conspiracy. See, e.g., Manning 79 F.3d at 217.

Likewise, the discovery of the additional evidence of heroin trafficking at 261 Aiken Avenue on April 18, 2003, is of particular relevance in this case because it supports the inference that there was a common plan or scheme to distribute heroin from the location. Rodriguez's residence at 261 Aiken Avenue is the same location where, on June 6, 2004, after seizing 10 grams of heroin from Rodriguez himself, investigators found 50 grams of heroin after a call from Santiago indicated that he (Santiago) would deliver 60 grams of heroin to Rodriguez. It is also the same location where Rodriguez was arrested on October 15, 2004, and found to be in possession of heroin, once again packaged in "moonwalk" baggies. These baggies are precisely the same type of baggies that were seized from his apartment on April 18, 2003.

The additional heroin trafficking evidence from April 18, 2003, and September 28, 2002, is made more compelling by the fact that the discovery of heroin, cash, a scale, and the log book took place merely months before the alleged conspiracy. See, e.g., United States v. Rodriguez-Estrada, 877 F.2d 153, 156 (1st cir. 1989) ("When, as in this case, the linked incident occurs close in time, and is highly relevant to the charged conduct, the argument for admissibility is powerful"); United States v. Devin, 918 F.2d 280, 288 (1st Cir. 1990) ("Put another way, "other acts" evidence which

is closely bound up with the crimes charged is eligible for admissibility under Rule 404(b)"); see also United States v. Varoudakis, 233 F.3d 113, 121 (1st Cir. 2000) (Sixteen months is "sufficiently proximate in time to warrant admission under 404(b)"); see also United States v. Wacker, 72 F.3d 1453, 1468-1469 (10th Cir. 1996) (allowing co-conspirators to give 404(b) testimony, in 1993 trial, about defendant's drug-related misconduct dating back to the late 1970's because evidence showed "long-standing pattern of drug activity" and was "integrally related to the criminal conduct charged in the indictment."); United States v. Brown, 923 F.2d 109 (8th Cir. 1991)(mere fact that the wrongful conduct occurred . . . after the offense charged does not affect 404(b) analysis).

Regardless of whether Rodriguez or Miranda claim lack of knowledge or intent, the United States should still be permitted to introduce the evidence additional heroin trafficking to show knowledge, intent, and plan.   See United States v. Ferrer-Cruz, 899 F.2d 135, 138-39 (1st Cir. 1990); United States v. Oppon, 863 F.2d 141, 146 (1st Cir. 1988); United States v. LaTorre, 922 F.2d 1, 8 (1st Cir. 1990).  Accordingly, the additional cocaine trafficking evidence bears "special relevance" to the issues in this case.

Moreover, the probative value of the additional heroin trafficking evidence is not substantially outweighed by any risk of unfair prejudice.  Although evidence of other drug activities invariably prejudices a defendant, "the prejudice is frequently outweighed by the relevancy of the evidence when a defendant's knowledge or intent is a contested issue in the case."  United States v. Francesco, 725 F.2d 817, 822 (1st Cir. 1984) (citations omitted).  "The fact that a piece of evidence hurts a party's chances does not mean it should automatically be excluded, [or] there would be precious little left in the way of probative evidence in any case." United States v. Carty, 993 F.2d 1005, 1011 (1st Cir. 1993) (quoting Onujiogu v. United States, 817 F.,2d 3, 6 (1st Cir. 1987)).

Finally, the Court can minimize any potential danger of unfair prejudice caused by the admission of this evidence by issuing a limiting jury instruction regarding the proper relevance of the evidence. The First Circuit has approved the use of such limiting instructions as an appropriate means of protecting a defendant against the possibility that a jury might draw improper conclusions from a defendant's prior bad acts.[5]

### 3. Evidence of Rodiguez's additional heroin trafficking is admissible because it will corroborate the testimony of key government witnesses

At the trial the defendant may seek to impeach the testimony of the agents and investigators involved in the investigation by questioning their motive for targeting Rodriguez. Once the credibility of those witnesses has been called into question, the evidence of Rodriguez's and Miranda's prior heroin trafficking is admissible to corroborate the testimony of those witnesses. See United States v. Figueroa, 976 F.2d 1446, 1454 (1st Cir. 1992)(rule 404(b) permits introduction of evidence for purely corroborative purposes on matters "significant to the prosecutor's case"); United States v. Blakely, 942 F.2d 1001, 1019 (5th cir. 1995) (once credibility of government witness had been

---

[5] See, e.g., Garcia, 983 F.2d at 1173 ("district court handled the prior acts evidence with care, providing the jury with a limiting instruction . . . and again instructing the jury of the scope of prior acts evidence in his final charge."); Nickens, 955 F.2d at 125-126 ("given that the court minimized prejudice to [defendant] by giving clear limiting instructions to the jury, we are satisfied that the district court did not abuse its discretion in admitting the evidence of [defendant's] prior drug conviction."). The limiting jury instructions from Garcia and Nickens, which were approved by the First Circuit, are attached collectively as Attachment 3. With respect to the instructions in Nickens, the First Circuit noted:

> Counsel on both sides expressed their satisfaction with this instruction in a bench conference with the judge. In its final instruction to the jury, the court repeated the same limiting instruction about the prior crimes evidence that it had given before.

Nickens, 955 F.2d at 126.

challenged by defense, 404(b) evidence to corroborate was admissible); United States v. Everett, 825 F.2d 658, 660 (2nd Cir.1987) (admitting 404(b) evidence for corroborative purposes where the corroboration is "direct and the matter corroborated is significant") (citation omitted).

## Conclusion

Based on the foregoing, the government respectfully requests that it be permitted to offer the additional heroin trafficking evidence (1) recovered by the Lowell Police pursuant to a search warrant executed on April 18, 2003, at 261 Aiken Avenue, Apartment 2, Lowell, Massachusetts, the residence Jose O. Rodriguez ("Rodriguez"), and (2) recovered during the arrest of Pedro A. Miranda ("Miranda"), a/k/a Carlos Colon, and seized from 129 Westford Street, Apartment #6, Lowell, and 11 Payne Street, Lowell, MA, September 28, 2002.

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

By: /s/: William F. Bloomer
WILLIAM F. BLOOMER
Assistant U.S. Attorney
BBO# 553104
william.bloomer@usdoj.gov
(617) 748-3644

## CERTIFICATE OF SERVICE

I, William F. Bloomer, hereby certify that this document filed through the ECF system on September 15, 2006, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non registered participants this date via US Postal Service, postage prepaid.

/s/: William F. Bloomer
WILLIAM F. BLOOMER

Date: 15 September 2006